ORTHO DIAGNOSTIC SYSTEMS INC., Plaintiff,

v.

MILES INC., Defendant.

No. 90 Civ. 5043 (WCC).

United States District Court, S.D. New York.

Oct. 21, 1994.

See also 848 F.Supp. 508.

Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City (William G. Todd, Porter F. Fleming, Michael F. Hurley, of counsel), for plaintiff.

Bartlit Beck Herman Palenchar & Scott, Chicago, IL (Fred H. Bartlit, Jr., Mark E. Ferguson, David Berten, of counsel), and Sprung, Horn, Kramer & Woods, Tarrytown, NY (Arnold Sprung, Nathaniel D. Kramer, Ira J. Schaefer, of counsel), for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge:

Plaintiff Ortho has moved for judgment as a matter of law or alternatively for a new trial in this action charging infringement by defendant Miles of two patents owned by plaintiff and covering apparatus and methods for photoanalysis of small particles such as blood cells entrained in a thin, rapidly flowing stream of liquid. The action was tried before a jury beginning July 5, 1994. On July 22, 1994, the jury returned a verdict of non-infringement and invalidity of all of the patent claims sued upon. Defendant Miles has counter-moved for amendment of the judgment entered July 27, 1994 to include findings of inequitable conduct in the prosecution of one of the two patents in suit and of "exceptional circumstances" supporting the award of attorneys fees pursuant to 35 U.S.C. § 285. For the reasons stated hereinafter, both motions are denied.

## THE PATENTS IN SUIT AND THE APPLICATIONS THEREFOR

The two patents in suit are U.S. Patent No. 3,705,771, issued December 12, 1972 on Photoanalysis Apparatus ("the '771 patent") and U.S. Patent No. 3,785,735, issued January 15, 1974 on Photoanalysis Method ("the '735 patent"). Both derive from the same original application Serial No. 2,750, filed January 14, 1970 in the names of three inventors, Mitchell Friedman, Louis A. Kamentsky and Isaac Klinger. On January 19, 1972, that application was divided, with the apparatus claims being retained in the original application and a divisional application Serial No. 219,187 being filed containing the method claims. Both patents in suit have expired so that this action is for damages only.

## THE PATENTED INVENTIONS

The specification and drawings of both patents, which are substantially identical, describe and show an apparatus for focusing a beam of light from a source, such as a helium-neon laser, on the liquid containing the particles, such as blood cells, to be analyzed, which liquid is flowing within the cylindrical bore of a glass tube oriented perpendicularly to the axis of the beam. The liquid in which the particles are entrained is surrounded by another liquid, which forms a sheath around the entraining liquid and confines it to an

area near the central axis of the bore in a stream which is of such narrow diameter as to permit the particles to cross the beam axis only one at a time. The light beam is focused on such a small longitudinal portion of the bore that it illuminates only one of the passing particles at a time. However, the beam is oblong at the focal point, being sufficiently wide, in the plane transverse to the axis of the bore, to assure that no particles can pass the beam axis without being illuminated, even though the position of the particle stream might shift laterally within the bore due, for example, to jarring of the apparatus or ambient temperature changes causing expansion or contraction of its components.

Depending upon certain characteristics of the particles, for example, the type of the blood cells, they selectively absorb the incident light or scatter it to different angles from the beam axis. The light transmitted through or from the particles is simultaneously detected by several photoresponsive devices respectively arranged to receive light at different angular positions relative to the beam axis. The characteristics of the cells may be determined by analysis of the output of these detectors, for example by the distinctive patterns of the groups of dots plotted on a histogram or graph in which the coordinates of each dot respectively represent the output of two of the detectors as the cells pass the beam axis or "interrogation zone."

The method of the '735 patent employs the apparatus of the '771 patent to analyze biological cells which have been treated with a dye which is selectively picked up by cells having certain characteristics and not by other cells having different characteristics. The dye affects the absorption of the incident light by the cells, and the difference in absorption is detected, for example by a photoresponsive pickup element positioned along the optical axis on the side of the sample chamber opposite from that of the source of light.

## INFRINGEMENT OF THE '771 PATENT

Of the 38 claims of the '771 patent, plaintiff charges that Claims 1, 3, 6, 7, 16 and 32 have been infringed by defendant's manufacture,

use and sale of its H–1 family of instruments. Of the six claims in suit, only Claims 1 and 16 are independent claims; Claims 3, 6 and 7 are dependent on Claim 1 and Claim 32 is dependent on Claim 16. The parties stipulated that if either of the two independent claims is infringed, all of the claims dependent on it are also infringed. Claim 1 has been regarded by both parties as typical. It reads (with the elements numbered for convenient reference, and with the only portions in dispute, insofar as concerns the issue of infringement, emphasized):

1. Apparatus for simultaneous optical measurement of several characteristics of each particle of a group of small particles such as blood cells while the particles are suspended in a liquid, comprising

(1) a source of light,

(2) a housing comprised of a material which transmits light from said source and defining an optical chamber,

(3) means for moving the particle suspending liquid through said housing in a thin narrow stream to convey the particles in sequence through the stream one by one,

(4) *means for directing light from said source into one side of said housing* to intersect with the thin stream of particles in a narrow beam *substantially converging at the intersection with the stream of particles* and operable to intersect the entire particle stream, and

(5) at least two photoresponsive pickup elements positioned outside the housing *at different angular positions with respect to the direction of said beam* when measured from the intersection with the stream of particles,

(6) said photoresponsive pickup elements being effective to simultaneously detect different optical reactions of each particle to illumination from the beam.

Claim 16 is similar to Claim 1 except that:

(a) Claim 16 requires only one photoresponsive pickup element; and

(b) Claim 16 describes the light-directing means of element (4) as:

"being operable in cooperation with said side of said housing to converge said light beam into a substantially elliptical shape ... the major axis of the elliptical shape of said beam being substantially perpendicular to the direction of the stream of particles and the dimension of said beam at said major axis being substantially greater than the transverse dimension of said particle stream."

*Claim 1*

Defendant originally contended that its H–1 instruments did not infringe Claim 1 and the claims dependent on it because, instead of having two photoresponsive pickup elements positioned "at different angular positions with respect to the direction of said beam;" they have one pickup element positioned on the axis of the beam and only one whose position is angularly displaced from the axis. Shortly before trial, defendant made a motion for summary judgment of non-infringement of Claim 1 on that ground. In an opinion filed April 8, 1994, the Court denied that motion on the ground that in the patent claims, as properly interpreted in light of the specification and the prosecution history of the patent, the "photoresponsive pickup elements" include not only the light sensors themselves, but the mirrors, lenses and other optical elements which pick up the light and direct it to the sensors, and the location of the photoresponsive elements is not determined by the location of the sensors but by the point at which light is picked up for transmission to them. In defendant's H–1 machines, although one of the sensors is located on the light beam axis, a dark stop in the light path, having an annular aperture, allows only light picked up at a predetermined range of angular displacement from the beam axis to reach the sensor. Thus the Court determined that Claim 1 should be so construed that this "photoresponsive pickup element" could be one of two such elements in the H–1 apparatus "located at different angular positions with respect to the direction of said beam."

■ Although, in a jury case, the issue of infringement is one of fact to be decided by the jury, the construction of the claims is a matter of law to be resolved by the court. *Hormone Research Foundation v. Genentech, Inc.,* 904 F.2d 1558, 1563 n. 7 (Fed.Cir. 1990), *cert. dismissed,* 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991), citing *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1579–80 (Fed. Cir.1989). Accordingly, at the trial, the Court instructed the jury that, as properly interpreted in light of the specification and the prosecution history of the patent, this element of the claims should be given the same construction given it by the Court in its opinion denying defendant's motion for summary judgment, as discussed above. As might be expected, this instruction was specifically approved by plaintiff. Less expectedly, it was apparently accepted by defendant because, in his final argument to the jury, defendant's counsel did not ask for a finding of non-infringement based on the absence of this element in the H–1 instruments.

In his opening statement to the jury at the start of the trial, defendant's counsel stated that none of the claims in suit should be found to have been infringed for the additional reason that in defendant's H–1 instruments the light beam is not "substantially converging at the intersection with the stream of particles," as called for in Claim 1 and, in somewhat different words, in the other independent claims of both patents in suit. Defendant's counsel contended that in the H–1 apparatus, the beam converges, in the plane transverse to the particle stream, to a focal point located within the sample housing but slightly in front of the particle stream so that, before the beam reaches the particle stream it has started to diverge again. In its charge at the end of the trial, the Court instructed the jury that the claim language in question requires substantial convergence of the light beam only in the longitudinal plane, so that only one particle at a time is illuminated, and that substantial convergence in the transverse plane is not required; indeed, insofar as the transverse plane is concerned, the claims specify that the beam is sufficiently wide "to intercept the entire particle stream." Again, plaintiff expressly approved this instruction, and defendant apparently accepted it because, in his final argument, defendant's counsel did not ask for a finding of non-infringement based

on the absence of this element in the H–1 instruments.

■ This leaves only one basis on which the jury might properly have found non-infringement of Claim 1, namely the element which calls for "means for directing light from said light source into one side of said housing...." Defendant properly contends that the last sentence of 35 U.S.C. § 112 requires that such a means-plus-function claim element "shall be construed to cover the corresponding structure ... described in the specification and equivalents thereof." The Court of Appeals for the Federal Circuit has emphasized that, "The statute means exactly what it says: ... the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function...." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).

In its charge to the jury in this case, the Court gave appropriate instructions concerning the determination of infringement of means-plus-function claim elements, and the meaning of equivalence in accordance with *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) and its progeny. Plaintiff expressed approval of the charge. Although the jury was not asked to return a special verdict on the issue of equivalence, their verdict of non-infringement was apparently based on a finding that the light system in the accused H–1 instruments is not the equivalent of that disclosed in the patents in suit.

■ Equivalence, or the lack of it, is an issue of fact for a properly instructed jury. *Id.* at 609, 70 S.Ct. at 856–57. A motion for judgment notwithstanding a jury verdict must be considered under the strict standard set by the Court of Appeals for the Federal Circuit in *Perkin–Elmer Corporation v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984):

When a party moves for JNOV, the trial court must consider all the evidence in a light most favorable to the non-mover, must draw reasonable inferences favorable to the non-mover, must not determine credibility of witnesses, and must not substitute its choice for that of the jury between conflicting elements of the evidence. [citations omitted] Following those guidelines, the court determines whether the evidence so viewed constitutes "substantial evidence" in support of the jury's findings and, if so, whether those findings can support the legal conclusions necessarily drawn by the jury in accord with its instructions enroute to its verdict. [citation omitted] "Substantial" evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review.

At the trial of this case, defendant introduced evidence of differences between the structure of the light-directing means of its H–1 instruments and that disclosed in the '771 patent and between the results obtained by these means. That evidence established that in the apparatus disclosed in the patent the light beam is focused, by a combination of spherical lenses and a pair of cylindrical lenses oriented perpendicularly to one another, into an elliptical area at the particle stream which is so narrow in the longitudinal plane relative to the stream that it illuminates only one of the passing particles at a time, while being sufficiently broad in the transverse plane that it illuminates the entire particle stream. There was evidence that this optical system produces a distribution of light across the width of the elliptical area which is Gaussian or bell-shaped, with maximum intensity at the center which tapers off toward the lateral edges of the illuminated area, and that particles which pass through outer portions of the target area are therefore illuminated at lower levels of intensity, which might result in a erroneous output reading. The evidence showed that in the optical system of the H–1 instruments, by contrast, the light is focussed on a rectangular slit in a mask, and the image of that rectangular slit is focused on the sample chamber. Defendant's expert witness testified that the mask containing the rectangular slit blocks about 80% of the circular beam

which is directed against it and allows only light from the central portion of the beam to pass through and be imaged at the sample chamber, with the result that the particle stream is illuminated more uniformly across its width and there is less possibility of a erroneous output reading.

As noted above, on a motion for JNOV, the Court is limited to a determination of whether such evidence might be accepted by a reasonable juror. I cannot conclude that the evidence referred to above could not be so accepted. It is of no consequence that, in a non-jury trial, I would have resolved the issue differently. Plaintiff demanded a jury trial and must accept the consequences of that choice.

■ In its Memorandum in support of the motion, plaintiff does not argue the equivalence of the optical system of the H–1 instruments with that disclosed in the patents in suit. Instead, plaintiff merely argues that the issue was foreclosed by defendant's answer to a request for admissions served upon it by plaintiff and by the opening statement of defendant's counsel. Plaintiff's request to admit No. 13 asked defendant to admit that:

> "The H–1 has *a* means for directing light from the light source into one side of the housing."

■ Defendant admitted this statement, because the H–1 instruments undeniably have "a means" for directing light into one side of the housing. Plaintiff understandably construed the answer as an admission that the H–1 included *the* means for directing light called for in Claim 1, because the request which was answered was one of a series which tracked the elements of that claim. However, the way the request was worded gave defendant no alternative but to admit it. It is unfortunate that plaintiff was misled by the answer, but the fault lay in the wording of the request which plaintiff's counsel had drafted. Any ambiguity in a request to admit is construed against the drafter. *Talley v. United States,* 990 F.2d 695, 699 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 190, 126 L.Ed.2d 148 (1993).

The misleading effect of defendant's answer was compounded by defendant's summaries of the anticipated testimony of its expert witness, Gregory Colella, which were served on plaintiff. In the first summary, dated March 30, 1994, it was stated that:

> "Claim 1 of the '771 patent as properly interpreted required a light beam which is shaped by a lens system to converge on a particle stream. The accused devices illuminate a rectangular slit or aperture which is imaged on a flow cell and thus do not have this feature and therefore do not infringe on this basis."

Because this statement left unclear the reason why this rendered the language of the light-directing element of Claim 1 unreadable on the accused instruments, and because the entire summary was duplicated, *in haec verba,* in the summary of the anticipated testimony of another witness, in violation of my local rule against redundant expert testimony, I directed defendant to file amended summaries. The amended summary of Colella's testimony, served on June 10, 1994, added the clause emphasized below:

> "The accused device illuminates a rectangular slit or aperture which is imaged on a flow cell, *the light beam diverging as the image is formed.*"

Thus defendant gave specific notice that, in contending against the readability of the light-directing element of Claim 1 to the H–1 instruments, it would rely upon the divergence of the beam before it reaches the particle stream, with no mention of the claimed advantage that forming an image of an aperture has in enabling more uniform distribution of light intensity across the width of the particle stream.

Defendant's misdirection as to its contentions was reinforced by the opening statement of defendant's counsel at the trial that, "There is [sic] just two things you will be hearing from me about on the infringement.... We don't converge, we diverge. We don't have their pickups, we have our pickups."

This was an obvious reference to the second and third portions of Claim 1 emphasized above, with no mention of the first emphasized portion. It appears obvious that at that point defendant had decided to base its

contention of non-infringement only on the facts that in the H–1 instruments (1) the beam is diverging in the transverse plane at the point where it impinges on the particle stream and (2) one of the two sensors is located on the axis of the beam.

However, during the trial defendant devoted considerable time to the evidence discussed above, to the effect that the light-directing means in the H–1 instruments functions in a different way from the means disclosed in the patents in suit, and with different results, so that the means-plus-function element (4) in Claim 1 is inapplicable to the H–1 instruments. Plaintiff's counsel neither objected to this evidence nor moved for a continuance to permit time to prepare for presentation of evidence to the contrary.

Moreover, as mentioned above, after the Court had informed counsel at the charging conference the day before the final arguments were made that it would instruct the jury that the second and third portions of Claim 1 emphasized above should be construed contrary to defendant's contention for a construction that would render these two portions of the claim unreadable on the H–1 instruments, defendant's counsel did not discuss these elements in his summation, but based his entire argument of non-infringement on the first emphasized portion. This was likewise done without objection from plaintiff's counsel. Thus the jury had before it, without objection, not only evidence on which they could reasonably base a finding of non-equivalence, but also a summation of that evidence. After they have ruled on the evidence, the Court is reluctant to nullify that ruling because they received too much evidence, when all of the evidence was relevant, competent and indisputably admissible but for the lack of proper notice of defendant's intention to introduce it, an omission unremarked at the trial. See *Bradford Trust Co. v. Merrill Lynch*, 805 F.2d 49, 53 (2d Cir.1986), and *Sadowski v. Bombardier, Ltd.*, 539 F.2d 615, 618 (7th Cir.1976).

For these reasons, the Court concludes that the jury's verdict of non-infringement of Claim 1 and the claims dependent on it should not be set aside.

*Claim 16*

■ Claim 16 includes a "means for directing light" element similar to that of Claim 1, and the jury's finding of non-infringement of Claim 16 must therefore be allowed to stand for the reasons given above, and for the additional reason that Claim 16 further requires that the beam is converged "into a substantially elliptical shape . . . at the point of intersection with the position of the thin stream of particles." There was evidence that in the H–1 instruments the image of the aperture formed at the particle stream is rectangular, not elliptical, and the jury could reasonably have found that this means-plus-function element was inapplicable to those instruments for lack of equivalence of such a light system to that disclosed in the patents in suit.

## INFRINGEMENT OF THE '735 PATENT

■ Defendant's only substantial defense against the charge of infringement of the '735 patent was that it had an implied license under that patent by virtue of an express license it had taken under a group of plaintiff's patents covering the use of certain monoclonal antibodies for staining blood cells to permit their differentiation as to cell type. Although, the license agreement recited that no license was granted under any of plaintiff's patents not specifically listed therein, plaintiff knew at the time that defendant intended to use the licensed materials in its H–1 instruments, which would constitute infringement of the '735 patent if there were no license thereunder, but said nothing to discourage such use. Later defendant wrote plaintiff a letter which clearly indicated defendant's belief that plaintiff had consented to such use and plaintiff apparently did not respond to that letter. That evidence could have convinced a reasonable jury that plaintiff had acquiesced in defendant's use of the patented method and thus is sufficient to defeat plaintiff's motion for JNOV.

## VALIDITY OF THE '771 AND '735 PATENTS

Because both of the patents in suit have expired, the Court's decision to leave undisturbed the jury's finding that neither patent

has been infringed by defendant makes it unnecessary to consider whether to set aside the jury's finding that both patents are invalid.

## DEFENDANT'S MOTION FOR AMENDMENT OF THE JUDGMENT

Defendant seeks amendment of the judgment to include findings of inequitable conduct in the prosecution of the application of the '771 patent and of "exceptional circumstances" supporting the award of attorneys fees pursuant to 35 U.S.C. § 285. The inequitable conduct is said to consist of failing to make a timely disclosure to the Patent and Trademark Office ("PTO") of two prior patents and one prior publication which were known to the applicants and which disclosed elements of the claimed apparatus which were not disclosed by any of the prior art cited by the PTO. The withheld references include (1) the applicant Kamentsky's own prior U.S. patent No. 3,413,464 issued in 1968 ("Kamentsky '464"); (2) an article by Kamentsky and others published in *Cancer* in 1968; and (3) an article by P. Crosland–Taylor and others published in *Blood* in 1958.

In the seminal case of *Precision Instruments Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), the Supreme Court established the principle that patent applicants have an "uncompromising duty of candor" which requires them to bring to the attention of the PTO any information known to them which might reasonably affect the decision whether to grant a patent on the application. In 1977, this principle was codified in the PTO Rules of Practice, 37 C.F.R. § 1.56(a), and has been applied by the Court of Appeals for the Federal Circuit in a long series of decisions beginning, in the first year of the Court's existence, with *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir. 1983). This duty of candor requires applicants to disclose to the PTO any prior art not cited by it which is "material," in the sense that "a reasonable examiner would consider [it] important in deciding whether to allow the application to issue as a patent." *A.B.*

*Dick Co. v. Burroughs Corp,* 798 F.2d 1392, 1397 (Fed.Cir.1986).

The withholding of known, material prior art with the intent of influencing the prosecution of the application constitutes inequitable conduct which renders the resulting patent unenforceable. *La Bounty Mfg. Co. v. United States Int'l Trade Commission,* 958 F.2d 1066, 1070 (Fed.Cir.1992). In determining whether an applicant has been guilty of inequitable conduct, a court must determine "whether the withheld references satisfy a threshhold level of materiality" and "whether the applicant's conduct satisfies a threshhold showing of intent to mislead." *Halliburton Co. v. Schlumberger Technology Corp.,* 925 F.2d 1435, 1439 (Fed.Cir.1991). These two determinations are interrelated and must be balanced against one another. "The more material the omission, the less culpable the intent required, and vice versa." *Id.* Because inequitable conduct carries the severe consequence of unenforceability of the patent, it must be proved by evidence which is clear and convincing. *Tol–O–Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft,* 945 F.2d 1546, 1554 (Fed.Cir.1991). Inequitable conduct must be regarded as the rare exception, and not as "a magic incantation to be asserted against every patentee." *FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1415 (Fed.Cir.1987).

Plaintiff here contends (1) that the three references which the applicants allegedly withheld from the PTO were not material in the sense defined above but merely cumulative of the art cited against the application for the '771 patent, and (2) that the applicants, in a Rule 312 amendment filed after a notice of allowance of the application had been mailed, called to the attention of the PTO two of the three references, the Kamentsky '464 patent and the Crosland–Taylor article in *Blood.*

A comparison of the art cited by the PTO with the three references in question and a review of the prosecution history of the '771 patent convinces me that the PTO's failure to consider at least some of the latter references could reasonably have affected the decision to issue the patent. The Crosland–Taylor article discloses an electronic blood-

cell-counting apparatus in which sheath flow is employed to confine the cell-entraining liquid in a stream only about 20 microns in width (as compared to the diameter of blood cells, which ranges from 5 to 15 microns) and convey it at high speed across the optical axis so that only one cell passes the axis at a time and the cells are counted by means of light flashes picked up by a microscope which focuses them on a photoresponsive device connected to an electronic counter. There was no reference cited by the PTO which is as relevant as Crosland–Taylor to the feature described in element (3) of Claim 1 of the '771 patent. The closest cited reference was the Sloan U.S. patent not. 2,816,479. However, as the applicants pointed out in their argument to overcome a rejection of Claim 1 based on Sloan, "particles do not pass through the Sloan chamber one by one."

Defendant also argues that the Kamentsky '464 patent and the Kamentsky et al. article in *Cancer* are more relevant to element (4) of Claim 1 of the '771 patent than any of the art cited by the PTO. The record does not make that apparent. Although, as the applicants pointed out during prosecution of the application for the '771 patent, in the Sloan reference the beam is not "substantially converging at the intersection with the stream of particles," so that only one particle is illuminated at a time, none of the allegedly withheld references contains a clear disclosure of that feature. In the Kamentsky '464 patent, for example, the light is directed by a condenser lens onto an apparently wide area of the flow cell, and an objective lens on the opposite side of the flow cell images a 100–micron section at the center of the flow channel onto an aperture. Nevertheless, the combination of the uncited Crosland–Taylor article with Sloan and/or the cited Parker et al. U.S. patent No. 2,875,666 is a more relevant combination of references than any that was considered by the PTO. The Court therefore concludes that the element of materiality of the allegedly withheld references has been satisfied.

Plaintiff urges that an intent on the part of the applicants to mislead the PTO cannot be shown because two of the three references in question were brought to the attention of the PTO in a Rule 312 amendment filed after the Notice of Allowance had been mailed. Defendants correctly point out that, in addition to the lateness of its filing, the amendment did not comply with the PTO requirements for the disclosure of such information and that applicants' experienced patent attorney knew or should have known that in these circumstances the additional art would not be considered by the PTO. Rule 707.05(b) of the Manual of Patent Examining Procedure, which was in effect during prosecution of the application for the '771 patent, states that such disclosures should be accompanied by a copy of the references and a detailed discussion of them and of the manner in which the claimed subject matter distinguishes over them. None of those requirements was met in this case. Moreover, Rule 707.05(b) provides that disclosures which do not comply with those requirements "will merely be placed in the file" and not considered by the PTO. Here applicants were expressly notified that the prior art listed in their late and informal disclosure "has not been considered since the prosecution in this case has been terminated." They could, of course, have insured that this art would be considered by filing a continuation application with a proper and timely information disclosure statement, but they did not avail themselves of that opportunity.

However, it remains to be decided whether this is a sufficient showing of intent to support a finding of "exceptional circumstances" supporting an award of attorneys fees under 35 U.S.C. § 285. As Judge Nies stated in her concurring opinion in *Argus Chemical Corp. v. Fibre Glass–Evercoat Co., Inc.*, 812 F.2d 1381, 1387 (Fed.Cir.1987):

... our cases reflect three standards for judging the misconduct by a patentee dependent upon the extent of relief which the opposing litigant seeks: (1) misconduct which makes a patent unenforceable (which we have termed "inequitable conduct"); (2) misconduct which is sufficient to make a case "exceptional" under 35 U.S.C. 285 so as to warrant, in the discretion of the trial judge, an award of attorney fees, and (3) misconduct which rises to the level of common law fraud and which

will support an antitrust claim. As a litigant moves from a purely defensive position, to a recoupment request, to an affirmative claim for damages, it is reasonable to impose more stringent requirements.

After thorough consideration of the evidence in this case, I conclude that, even though it might support a finding of inequitable conduct which would bar enforcement of the patent, it falls short of establishing the level of culpability necessary for a finding of "exceptional circumstances" which would justify ordering plaintiff to reimburse the attorneys fees paid by defendants. In reaching this determination, I have weighed defendant's own conduct, including its successive changes of position on the issue of infringement, and its failure to give notice in advance of trial that it would adduce evidence in support of its final theory of non-infringement, so that plaintiff was taken by surprise on that issue.

## SUMMARY

I have considered the other attacks made by plaintiff against the jury's verdict, including the charge of an improper summation by defendant's counsel, but find them to be without sufficient merit to warrant upsetting the verdict or granting a new trial.

For the reasons stated above, both plaintiff's motion for JNOV or for a new trial and defendant's motion for amendment of the judgment are denied in their entirety.

So ordered.